UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In Re:                                                    Chapter 11

Simry Realty Corp.,                                       Case No. 26-11409-PB

                                    Debtor.

--------------------------------------------------------x

### DEBTOR'S OBJECTION TO MOTION BY MICHELLE HARUVI FOR AN ORDER (I) DISMISSING BANKRUPTCY CASE PURSUANT TO 11 U.S.C. § 1112(b)(1) AND (II) GRANTING RELATED RELIEF

Simry Realty Corp. (the "Debtor" or "Simry"), by and through its undersigned proposed counsel, hereby submits this objection (this "Objection") to the *Motion by Michelle Haruvi ("Michelle") for an Order (I) Dismissing Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b)(1) and (II) Granting Related Relief* [ECF No. 14] (the "Motion"). In support of this Objection, the Debtor relies upon the *Declaration of Arthur Haruvi* (the "Arthur Declaration"), filed contemporaneously herewith, and respectfully states as follows:

### OVERVIEW

1. It is extremely shortsighted for Michelle to analyze this Chapter 11 case in isolation, without due regard for the fact that Simry's bankruptcy is but the starting point for a far more expansive reorganization strategy, designed to enable the Simry Properties (as defined below) to pursue essential mortgage restructurings unencumbered by fierce intra-family litigation. The contemplated restructurings are expected to gain the support of all other stakeholders involved with the bankruptcies, at which point the operating entities, mortgage debt, creditors, employees, and income-producing properties will be before this Court as part of a coordinated restructuring.

2.      The need for Chapter 11 relief arises from economic reality, not litigation tactics. The Simry Properties are burdened by matured mortgage debt, pending foreclosure actions, substantial default interest, and litigation-based obstacles to restructuring.  The Bankruptcy Code provides the mechanism through which those issues can be addressed in an orderly and coordinated manner.

3.      Michelle's challenges to corporate authority and good faith fail on the facts and the law.  Arthur had authority to authorize the filing under Simry's governing documents, the 2011 Amendments, Abe's proxy and resignation, and the parties' course of corporate practice. The Debtor commenced this case to preserve value, facilitate a mortgage restructuring, and protect the underlying properties from further deterioration.

4.      Indeed, the needs of the underlying properties should dominate the good faith assessment.  Moreover, the same factual framework should also guide this Court's assessment of Michelle's companion motion to vacate the automatic stay, remand or abstain. These motions are two flipsides of the same coin and should be denied for many of the same inter-connected reasons.

5.      As is commonly understood, Chapter 11 is a value-maximizing tool and permits transactions to proceed (after Bankruptcy Court approval) even over the objections of a dissenting party such as Michelle, subject, of course, to a showing that the intended mortgage restructuring constitutes a sound exercise of the Debtor's business judgment and Michelle's equity interests will be adequately protected.  These core bankruptcy precepts form the backdrop for the Debtor's decision to seek Chapter 11 relief, which was done in the utmost good faith.

2

## THE SIMRY PROPERTIES

6.      The Debtor, along with Jade Venture Partners LLC, are the equity holders of Simry Holding LLC, which owns the equity in the underlying portfolio of seven multi-family residential apartment buildings in Manhattan (the "Simry Properties").

7.      As noted from the initial filings, the family litigation has prevented efforts to restructure the mortgage debt encumbering the Simry Properties[1] following maturity defaults in May 2025 due to the filing of blanket notices of pendency.  Since that time, enormous default interest and other fees and charges have accrued, badly and unnecessarily eroding asset values. Moreover, the buildings are now subject to pending foreclosure and potential receiverships.

8.      The Simry Properties, in combination, include 125 apartment units and have a combined fair market value of $69,700,000.   Under a mortgage modification being actively negotiated and hopefully closed imminently, the consolidated mortgages totaling approximately $183 million against the entire Haruvi family portfolio are being "split" or "spun-off" between Simry and non-Simry buildings, leaving the Simry Properties subject to a reduced modified mortgage of approximately $50 million.  Nevertheless, even modified, the Simry mortgage still remains in default, requiring a restructuring of the Simry Properties through their own Chapter 11 cases.

9.      The inability to move forward without Chapter 11 is directly attributable to the pending family litigation.  In February 2023, Michelle, in her capacity as a 17.73% minority shareholder of Simry, commenced suit under the New York Business Corporation Law ("BCL") to challenge and rescind a 2022 internal corporate restructuring involving her father, Arthur

---

[1] The Simry Properties consist of the following buildings: (i) 309 West 54th Street, New York, NY; (ii) 311 West 54th Street, New York, NY; (iii) 313 West 5th Street, New York, NY; (iv) 315 West 54th Street, New York, NY; (v); 244 West 74th Street, New York, NY; (vi) 38 West 75th Street, New York, NY; and (vii) 54 West 75th Street, New York, NY.

Haruvi ("Arthur"), her uncle, Abraham Haruvi ("Abe"), her sister, Aileen Haruvi ("Aileen"), and others.

10.     As part of the 2022 restructuring, title to the Simry Properties (then owned by Simry directly) were transferred to separate limited liability companies (the "SPEs") which each own a single building.  Michelle argued that the transaction was void due to the lack of a formal shareholders meeting under BCL § 909, even though there is evidence that Michelle was aware of the planned restructuring through her personal family interactions.  In any event, Michelle had no ability as a minority shareholder -- without a seat on the Board of Directors -- to vote to block the transaction.

11.     After an initial dismissal of Michelle's claims, her complaint under BCL § 909 was reinstated on appeal by the First Department without any finding of actual BCL liability. *See Haruvi v. Hungerford*, 233 A.D. 3d 478 (App. Div. 1st Dep't 2024).[2]  Reinstatement of the claims placed all of the properties in financial jeopardy, because the blanket notices of pendency were continued. Thereafter, with the fate of the Simry Properties still in limbo, foreclosure actions were commenced by FS CREIT Finance CB-1 LLC (Index No. 656112/2025) and FS Rialto 2021-FL3 Issuer, Ltd. (Index No. 656113/2025) (collectively, the "Lenders").

12.     Given the exigency generated by the foreclosures, additional follow-up Chapter 11 filings are being prepared for the SPEs. These cases, which will be jointly administered with the Simry case, are anticipated to be filed before the return date of this Motion on August 20, 2026.  The follow-up bankruptcy filings by the SPEs were expressly foretold in the Local Rule

---

[2] The First Department reversed the trial court's review of the transaction and ruled that the internal restructuring involved a "sale of all or substantially all of the business assets of Simry other than in the regular course of business" regardless of the fact that the certificate of incorporation provided that Simry could participate in real estate sales. *Id.* at 478.  Moreover, the First Department noted "there are issues of fact as to what information [Michelle] received about the transactions" and therefore neither side was entitled to judgment on the causes of action under BCL § 909.

1007-2 affidavit as well as in the scheduling stipulation signed by the parties.  *See* ECF Nos. 2 and 34.

13.    As part of the overall reorganization strategy, the minority stock interest of Michelle shall also be fairly and properly valued, fixed and paid in bankruptcy.  While the Chapter 11 filings are not designed to eliminate Michelle's equity interests at all, she cannot be permitted to hold the entire mortgage restructuring process hostage by dint of unadjudicated and highly contested claims under the BCL.

14.    In many respects, the long term survival of the Simry Properties hangs in the balance.  Contrary to the *ad hominem* assertions in the Motion, this Chapter 11 case is not a litigation gambit, or forum shopping, but a necessary prerequisite to achieving financial stability. To be sure, Simry is not a *per se* direct borrower under the mortgages, but its indirect subsidiaries certainly are, and they will shortly be before the Court, with a focused joint global reorganization strategy of their own.[3]

## **BACKGROUND**

A.    **The Simry Portfolio and 2022 Restructuring**

15.    Michelle has waged a years-long, contentious campaign against her immediate family – specifically, her father, Arthur, and his brother, Abe, who spent decades acquiring and developing an extensive portfolio of multi-family buildings in Manhattan.  Several years ago, in

---

[3] The Haruvi family portfolio consists of thirty (30) residential apartment building, the majority of which are not subject to Michelle's claims since they were never owned by Simry  However, the mortgages held by the Lenders cover all of the properties in the entire Haruvi portfolio under a consolidated mortgage instrument.  Negotiations are concluding to separate the Simry Properties from the other properties under the mortgages.  Once this is accomplished, the fee owners of the Simry Properties will have approval of the Lender to commence separate Chapter 11 cases to be jointly administered with this case.  As noted, the clear goal of the follow-up cases is to negotiate and implement a mortgage restructuring relating to the Simry properties so that the entire portfolio is relieved of foreclosure.

connection with his estate planning, Arthur and his wife gifted a minority interest in Simry to both Michelle and her sister, Aileen, evenly.

16.    Although Michelle did not contribute capital to acquire her minority interest in Simry, she now challenges the 2022 restructuring based on alleged notice defects notwithstanding contemporaneous communications indicating she had actual knowledge of the transactions even without a formal meeting.  A sample of these communications is summarized below, which plainly undermine Michelle's purported "no notice/no knowledge" defenses:

- **Feb. 5, 2021 — full structural disclosure.**  Email directed to Michelle, which stated that the S-Corps "will be handled as loans," "Arthur [is] in charge of everything," and "Abe controls nothing. Peter controls nothing." (MHARUVI_0000357; 0006602.)

- **Feb. 6, 2021 — Michelle's active Q&A.** "I am all day dealing with Q&A from Michelle." Sunday 2:00 p.m. structure call scheduled with Aileen and Michelle; Monday follow-up call set. (SS_00027184.)

- **Feb. 19–21, 2021 — independent advisor.** Michelle retained Vicky Canto to mark up the CIM term sheet — the very loan structure she now challenges — under "Please keep confidential" instructions. (MHARUVI_0006279.)

- **March 19, 2021 — threat directed at Abe.** Michelle wrote she would "happily defend what we're doing, especially if Abe is trying to get us to sign a fraudulent refinance package, after years of mismanagement and stealing from the company." (MHARUVI_0006082.)

- **April 2022 — real-time closing tracking.** Michelle corresponded with Abe about a completing "clean takeover" in which she would be "the pivot point," and asked on April 26, 2022 "so did the deal close?" (DOC-338 ¶¶ 37–39.)

B.    **Michelle's Derivative Litigation**

17.    Michelle commenced her first lawsuit in the Supreme Court, New York County in February 2023, seeking to rescind the entire transaction based on the lack of a BCL notice. Michelle asserted derivative standing to bring this litigation which was pending at the time of the commencement of this bankruptcy case and has since been removed.  Adv. Docket No. 1.

6

**C.      The Proposed Merger Litigation**

18.      A special meeting of the shareholders was called for July 2, 2025 to consider a proposed "buy-out merger" for Michelle's minority stock interest between Simry Realty Corp. and Simry Realty Merger Corp. (the "Proposed Merger").   Under the Proposed Merger, Michelle's 17.73135 % of Common Stock in Simry would be converted for the right to receive $4,061,055 (the "Merger Consideration") pursuant to Business Corporation Law §623. Following the noticed merger, Michelle would no longer have any shares of Common Stock in Simry but, instead, she would receive "fair value" for her shares. *Id.*

19.      In response, Michelle commenced a second lawsuit on June 30, 2025 seeking to enjoin the Special Meeting of the Shareholders.   The Supreme Court (Borrok, J.) granted a preliminary injunction, which is the subject of a pending appeal before the First Department, and has also been stayed by virtue of this Chapter 11 case.

**D.      Commencement of the Chapter 11 Case and Anticipated SPE Filings**

20.      The Debtor sought Chapter 11 relief on June 14, 2026 and the instant Motion was filed a few weeks thereafter. Purposefully obtuse, Michelle's motion nevertheless attempts to sidestep financial pressures that her litigation has imposed on the Debtor and the Simry Properties.  The same pressures explain why the operating subsidiaries will shortly be before the Court, establishing an integrated business which passes both the subject and objective tests of good faith. *See C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.)*, 113 F.3d 1304, 1312 (2d Cir. 1997) (incorporating the factors first enumerated in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D. Ky. 1992)).

21.     Insofar as Michelle's challenge to corporate authority is concerned, she incorrectly argues that Simry's bankruptcy case was commenced without requisite authority.[4] As will be established herein, Michelle relies on outdated documents regarding the composition of the Debtor's Board of Directors.  Under amendments signed in 2011 (the "2011 Amendments") before Michelle was gifted any interest, the Board was re-constituted to contain two directors: Arthur and Abe.  Following Arthur's buyout of Abe's interests in 2022, Arthur alone was conferred with the power to authorize this bankruptcy case.  Yet, even if, *arguendo*, two directors are required, Arthur was granted Abe's proxy for his shares and can vote on his behalf.

22.     More particularly, pursuant to an Irrevocable Proxy and Voting Agreement dated May 23, 2022 (the "Proxy"), Abe stepped away from the business, withdrew from the Board of Directors, and granted Arthur an irrevocable proxy to, *inter alia*, vote all of his shares in Simry. Pursuant to the Proxy, Arthur has the express authority to vote 64.5375% of the shares in Simry. He is also the President and the sole member of its Board.  *See* 2011 Amendment (with attached by-laws), Proxy and letter of resignation annexed hereto as Exhibits "A", "B" and "C", respectively.  The sum total of these documents clearly establishes the necessary authority for the commencement of this bankruptcy case.

23.     A lot of mud has been thrown concerning the Debtor's motives, but the reality is that Michelle has taken advantage of a technical (and ultimately immaterial) notice issue to promote her own self-interest at the direct expense of the financial stability of the Simry Properties.  The 2022 internal restructuring which she complains about was done among close

---

[4] Michelle is not and she never has been a member of the Board of Directors of Simry.  Accordingly, Michelle never had management rights or authority as a Board member, and her status as a shareholder was limited to a minority position without any ability to block or otherwise impede any decisions made by her father, uncle or sister, constituting the vast majority of interests.

family members and was necessary to complete a buy-out of Arthur's brother, Abe, while still leaving Michelle on par with her sister, Aileen.[5]   Although the First Department reinstated Michelle's BCL § 909 claims, there has been no actual determination that the internal restructuring was void or that any transaction should be rescinded.

24.   Although Michelle contests the validity of the mortgages, as an outgrowth of her claims under the BCL, the mortgages reflect bona fide debts and borrowings which need to be restructured.   That economic reality warrants a full evidentiary hearing concerning all of the issues raised in the Motion, as required under this Court's Local Rule 9014-2.

## ARGUMENT

### I.   This Chapter 11 Case Was Commenced With Proper Authority Under Simry's Corporate Governance Documents

24.   Michelle centers her attack on the Debtor's bankruptcy case on a perceived lack of corporate authority, disputing Arthur's right solely to approve the commencement of the Chapter 11 case.   Motion at 15-18.   The pertinent evidence, however, refutes Michelle's view of the Board and establishes that Arthur is the sole Acting Director with proper authority.

25.   Of note, Michelle relies upon outdated corporate documents, which were expressly amended in 2011 to reconstitute the Board to name only Arthur and Abe as the two Directors.   This was done at a time before Michelle was gifted her shares.   The 2011 Unanimous Written Consent and Resolution of the Shareholders, Directors and Officers of Simry Realty Corp., (referred to above as Exhibit "A"), is controlling and serves to nullify Michelle's arguments relating to the lack of authority.

---

[5] Michelle only first acquired her stock interest in the Debtor by virtue of the largess of her father, Arthur, for estate planning purposes, and it is truly unfortunate that she has turned against the family in such an unseemly and ungrateful manner.

26. In any event, formal meetings were not the norm at Simry. Michelle herself testified to the absence of formality at various times. Michelle herself testified that significant business decisions were often discussed and approved through informal family discussions. In her deposition, Michelle explained the informality of Simry governance as well as precedent for corporate financing without the need for shareholder meeting:

Q: At the time you became an individual holder of ownership interest in Simry Realty Corp., which you have stated here today was approximately 2017, how did Simry Realty Corp. typically make business decisions?
[Counsel objection]
A: Just talking about things informally.

              \*   \*   \*

Q: So you stated the decision were often made through informal conversations between you and your family members, correct?
[Counsel objection]
A: Yes, things were discussed and that's how people knew about major decisions, and sometimes there needed to be something signed to give approval, such as the Bethpage refinancing, which I was asked to sign.

              \*   \*   \*

Q: Did you agree with entering into the 2021 Bethpage refinancing transaction?
A: Yes.
Q: Did you agree with it beforehand or afterwards?
A: Beforehand I was asked for a signature of – for my approval.

              \*   \*   \*

Q: And you viewed the 2021 Bethpage refinancing as a valid transaction, correct?
[Counsel objection]
A: Yes, I thought it was.
Q: Do you think it was now?
A: Define the "valid transaction."
Q: However you understand it?
A: Yes, I believed it to be a valid transaction.
Q: Was that transaction approved pursuant to a formal meeting of the shareholders?
A: I don't know.
Q: Did you ever participate in a shareholder meeting regarding the 2021 transaction?
A: No.
Q: Were you ever given notice, written, electronic or otherwise, of a shareholder meeting to approve the 2021 transaction?
A: No.
Q: Is that because decisions were typically made informally?
[Counsel objection]
A: It's because decisions were, yeah, usually made talking, talking about big

10

Decisions, and signing off when necessary, such as the Bethpage refinancing. *See* Michelle Transcript annexed hereto as <u>Exhibit</u> "D", at p. 72, lines 7-15; p. 75, line 17-25; p. 76, lines 1-2; p. 79, lines 13-19; p. 81, lines 24-25; p. 82, lines 2-25; p. 83, lines 1-4.

27.     Michelle's key acknowledgment relating to the informal family meetings makes clear that Michelle cannot truthfully deny that she was unaware of the buy-out of her uncle and the related financing and changes in the ownership structure.

## A.     Authority to Seek Chapter 11 is Vested in the Board of Directors

25.     "[T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, *i.e.* to those who have the power of management." *Price v. Gurney*, 324 U.S. 100, 104 (1945).   State law governs who has the "power of management." *Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters.)*, 392 B.R. 541, 554 (S.D.N.Y. 2008) (quoting *In re Stavola/Manson Elec. Co.*, 94 B.R. 21, 24 (Bankr. D. Conn. 1988)).   Generally speaking, under New York law (which applies here), a corporation's directors have that authority, not officers or shareholders.   N.Y. Bus. Corp. Law § 701 (stating "the business of a corporation shall be managed under the direction of its board of directors"); *In re Source Enters.*, 392 B.R. at 554 (citing *In re Jefferson Casket Co.*, 182 F. 689 (N.D.N.Y. 1910)); *Gorbrook Assoc. Inc. v. Silverstein*, 40 Misc. 3d 425, 436 (N.Y. Dist. Ct. 2013) ("The business of a corporation is managed by its board of directors. The decision to institute litigation rests within the discretion of the board of directors."); *see also Weber v. Sidney*, 19 A.D.2d 494, 498 (App. Div. 1st Dept. 1963) (holding agreement between stockholders for equal compensate from corporate earnings was not enforceable where fixing of salaries was vested in board of directors).

11

26. While state law governs *authority* to file a petition, the *burden of proof* governing whether a petition has properly been filed is a question of federal law, with Michelle carrying the burden of proof. *In re Quad-C Funding LLC*, 496 B.R. 135, 141 (Bankr. S.D.N.Y. 2013) ("Because the Court does not take the issue of dismissal lightly, the Court will place the burden of proof entirely on the Movants to demonstrate by a preponderance of the evidence that the Debtors' bankruptcy cases were unauthorized." *Id*. at 142 (quoting *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010)).

27. The starting point for determining whether a board has acted within its authority begins, but does not end, with a company's certificate of incorporation and by-laws. The certificate of incorporation and by-laws are effectively "a contract between the corporation and its shareholders and among the shareholders *inter se*." *Mgmt. Techs. v. Morris*, 961 F. Supp. 640, 646 (S.D.N.Y. 1997).

28. In the absence of any prohibitory provision or statute, the certificate of incorporation and by-laws, as with any contract, "may be adopted and amended by acquiescence and custom and usage as well as by explicit action taken with all pertinent formality." *Id*. (collecting cases). This general rule is equally applicable under New York law. *See In re Flushing Hosp. & Dispensary*, 288 N.Y. 125, 131, (1942) ("For seven years the affairs of the corporation were, as we have said, administered in accordance with these 'new by-laws' and at no time did a member protest or challenge their validity. Waiver of irregularity is, in these circumstances, the reasonable implication which must be drawn from failure to object."). Closely held corporations can informally amend their governing documents easier than publicly held corporations. *Mgmt. Techs.*, 961 F. Supp. at 646.

12

## B.     The Corporate Practices of the Debtor

29.     As noted, the then-shareholders of the Debtor, Rachel Haruvi (Michelle's grandmother), Abe, and Arthur, unanimously agreed in 2011 to alter the total number of directors to two: "the number of directors of the Corporation shall be two (2)." *See* Exhibit "A". To deny the effects of these changes simply due to the fact that the document was not captioned as an amendment to the certificate of incorporation would be to impermissibly elevate form over substance, particularly since the recital to the 2011 Amendment states "the Corporate Book cannot be located, and the shareholders desire to restate the organizational documents of the Corporation and set forth the current ownership and board of directors of the Corporation." *See Zion v. Kurtz*, 50 N.Y.2d 92, 102 (1980).

30.     What was written on paper was later confirmed in practice. Following the 2011 Amendments, the Debtor functioned with only two Directors: Abe and Arthur. Arthur Declaration ¶ 12. That remained true until Arthur's buyout of Abe's interests. Arthur Declaration ¶¶ 12, 15.

31.     Following Rachel Haruvi's death in 2014, Abe and Arthur inherited Rachel Haruvi's shares in the Debtor and, for a time, served as equal shareholders and the Debtor's only directors. Arthur Declaration ¶ 13. Arthur would later gift portions of his equity interests to Michelle and Aileen, but retained his own ownership stake and remained a director along with Abe. *Id.* At no time did any equity holder, including Michelle, object to the fact that the Debtor had only two directors. *Id.*

32.     As events unfolded, Abe's and Arthur's equal decision-making powers caused them to increasingly come into conflict with each other. The situation eventually became

13

unworkable and led to the 2022 corporate restructuring, replete with Arthur's buy-out of Abe. Arthur Declaration ¶¶ 14-15.

33.     As part of the restructuring, Abe granted Arthur the Proxy to vote on behalf of his 50% stake in the Debtor and resigned from the Debtor's Board of Directors, leaving Arthur as the sole director.  *See* <u>Exhibits</u> "B" and "C", respectively.  As a result, Arthur is the sole director and therefore possesses authority to commence this bankruptcy case.  The BCL expressly contemplates and authorizes single director corporations.  N.Y. Bus. Corp. Law § 702(a) (setting the minimum number of directors at one member); *Alfred P. Sloan Found., Inc. v. Atlas*, 42 Misc. 2d 603, 605 (Sup. Ct. 1964), aff'd, 23 A.D.2d 820, 258 N.Y.S.2d 807 (App. Div. 2d Dep't 1965) (holding legislature expressly sanctioned one-man corporations).[6]

34.     Michelle's cited caselaw on corporate authority certainly does not require a different result.  Those cases involved governing documents, consent requirements, or court orders that expressly limited the authority to file a bankruptcy petition.  *See, e.g.*, *In re Pasta Bar by Scotto II, LLC*, 2015 WL 7307246, at *3 (Bankr. S.D.N.Y. Nov. 19, 2015) (holding bankruptcy filing required supermajority vote of the board); *In re JJ Arch*, 663 B.R. 258, 285 (Bankr. S.D.N.Y. 2024); (holding that state court order prohibited commencement of bankruptcy case by debtor); *In re Aamagin Prop. Grp., LLC*, 2024 U.S. Dist. LEXIS 20376, at *18 (M.D. La. Feb. 6, 2024) ("[B]ecause a unanimous consent of the parties was required to transfer all of the company's assts, a unanimous consent was required to place the company in bankruptcy."); *In re NNN 123 N. Wacker, LLC*, 510 B.R. at 859-60 (Bankr. N.D. Ill. 2014) (holding operating

---

[6] The Debtor's by-laws also permit action by a single director.  By-Laws Art III § 8 ("A majority of the entire Board of Directors shall constitute a quorum except that when the entire Board consists of one director, then one director shall constitute a quorum … .Except as herein otherwise provided, and except as otherwise provided by the New York Business Corporation Law, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.").

agreement required unanimous consent to commence bankruptcy cases, which was not obtained). No comparable limit exits here.

35.     The Debtor's Board was authorized to commence this bankruptcy case, and, in light of the 2011 Amendment, that authority ultimately resided with Arthur.  This remains true notwithstanding Michelle's notice arguments or the later efforts to add additional board members because Arthur controlled the votes necessary to expand the Board.  N.Y. Bus. Corp. Law § 702(b) ("The number of directors may be increased or decreased by amendment of the by-laws, or by action of the shareholders or of the board under the specific provisions of a by-law adopted by the shareholders … .").

36.     Finally, New York courts have recognized the power of individuals to act on behalf of a corporation, even where the power to act is not explicitly given to that individual, where such action is necessary to prevent the destruction or loss of the interests of the corporation. *W. View Hills, Inc. v. Lizau Realty Corp.*, 6 N.Y.2d 344, 346 (1959).  Arthur believed the facts and circumstances of this case necessitated the commencement of this Chapter 11 case and acted accordingly.  Arthur Declaration ¶ 16; *see also In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003) (holding that despite the fact that one partner improperly filed a bankruptcy petition, the filing did not warrant cause for dismissal and there was no basis for abstention).

37.     In view of all of the foregoing, there should be no genuine doubt that Arthur had and continues to have the requisite authority to act on behalf of the Debtor as its sole director and president. Accordingly, the motion to dismiss on authority grounds must be denied.

## II. The Debtor's Bankruptcy Case Was Commenced in Good Faith

38. Alternatively, Michelle seeks dismissal of this bankruptcy case alleging that it was commenced in bad faith, all the while ignoring the economic turmoil caused by her multiple litigations. The conventional bad faith analysis does not fit into Michelle's model, as she is not a secured creditor and this bankruptcy case was hardly filed on the eve of a foreclosure sale. Thus, the *Pleasant Pointe* factors should not be mechanically applied under the unique circumstances of this case. If anything, the relevant factors should be considered in conjunction with the contemplated Chapter 11 filings by the SPEs. These imminent additional bankruptcy cases will most assuredly expand this bankruptcy case beyond a sole stock holding company. By ignoring the upcoming additional filings and the economic reality of this situation, Michelle's analysis is myopic and lacks proper appreciation of the importance of stabilizing the Simry Properties going forward.

### A. The Second Circuit Standards of Good Faith

39. Although "bad faith" is not among the examples of "cause" listed in section 1112(b)(4) of the Bankruptcy Code, it is commonly understood that "the filing of a bankruptcy petition in bad faith constitutes 'cause' for dismissal or conversion of a case under the Bankruptcy Code section 1112(b)." *In re Ancona*, 2016 Bankr. LEXIS 4114, 2016 WL 7868696, at *3 (Bankr. S.D.N.Y. Nov. 30, 2016) (citing *C-TC*, 113 F.3d at 1312).

40. Under applicable law, a case can be dismissed for bad faith only if the evidence establishes "**both** objective futility of the reorganization process **and** subjective bad faith in filing the petition … ." *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (citing *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996)) (emphasis in original). In other words, bad faith involves a two

pronged test that "asks two questions: (i) whether there was 'no reasonable likelihood that the debtor intended to reorganize' (the 'subjective bad faith' prong); and (ii) whether there was 'no reasonable possibility that the debtor will emerge from bankruptcy' (the 'objective futility' prong)." *In re JJ Arch LLC*, 663 B.R. at 281 (citations omitted).

41.     Michelle bears the burden of proof under the 2005 BAPCPA amendments, which changed the statutory standard to permitting conversion or dismissal "if the movant establishes cause" under a revised Section 1112(b)(1).

42.     In assessing both the subjective and objective bad faith prongs, a court must examine the totality of the circumstances, focusing on whether the filing reflects "an intent to abuse the judicial process" or "the purpose of the reorganization process." *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 68 (E.D.N.Y. 2012).

43.     The most common factors to consider are the *Pleasant Pointe* factors, which the Second Circuit has expressly adopted.[7]  *C-TC*, 113 F.3d at 1311 (adopting the *Pleasant Pointe* factors in single-asset real estate cases).  The *Pleasant Pointe* factors include the following:

a.   the debtor has only one asset;
b.   the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
c.   the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
d.   the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
e.   the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
f.   the debtor has little or no cash flow;
g.   the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
h.   the debtor has no employees.

---

[7] The *Pleasant Pointe* factors are not a talisman and do not apply with equal force in all situations.  *See In re JJ Arch LLC*, 663 B.R. at 281 n.42 ("While the *Pleasant Pointe* factors may possess some applicability beyond the facts of that case, that applicability is limited in a case such as this one, where the Debtor is a holding company with no physical assets and was not facing a pre-petition foreclosure.").

17

*Id.* The *Pleasant Pointe* factors are only meant to be a guide. *In re SPAC Recovery Co.*, 676 B.R. 708, 717 (Bankr. S.D.N.Y. 2026).

**B.      The Court Should Employ a Holistic Approach and Take Into Account the Implications of the Additional Chapter 11 Filings by the SPEs Which Create a True Business Enterprise**

36.      Significantly, here, the good faith/bad faith analysis cannot be viewed in insolation. Instead, the Court should employ a holistic approach to this matter and consider the real estate enterprise in its entirety, based upon the anticipated SPEs Chapter 11 filings, to determine whether bad faith exists. *See In re General Growth Properties, Inc.*, 409 B.R. 43, 62 (Bankr. S.D.N.Y. 2009) (holding that "[t]he point is that a judgment on an issue as sensitive and fact-specific as whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor."); *see also In re Mirant Corp.*, 2005 WL 2148362, at *5-6 (Bankr. N.D. Tex. Jan. 26, 2005) (stating "the court holds that MirMA, as a key and integrated member of the Mirant corporate family, was placed in chapter 11 in good faith.").

**C.      The Debtor Acted With Subjective Good Faith in Commencing This Case**

37.      The Debtor commenced this case with a clear intent to reorganize. *In re SPAC Recovery Co.*, 676 B.R. at 718.  By comparison, subjective bad faith exists where a debtor's business prospects are utterly hopeless and the debtor is only seeking chapter 11 relief for the purpose of delay. *See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 522 (Bankr. S.D.N.Y. 1996).  However, where, as here, "the debtor evidences an intent to reorganize at the outset of the case," there is no subjective bad faith. *In re Sletteland*, 260 B.R. 657, 667 (Bankr. S.D.N.Y. 2001) (citing *In re Cohoes Indus. Terminal*, 931 F.2d 222, 227 (2d Cir. 1991)).

18

38.     Michelle at length complains that the timing of the commencement of the Debtor's bankruptcy case is "a litigation tactic" done to gain "a litigation advantage," and "avoid a further adverse ruling from the First Department," with no intent to reorganize. *See, e.g.*, Motion at 19-20, 22-24. Michelle's assertions about the Debtor's intentions are speculative and, in any event, wrong. The Debtor has stated its goals for the bankruptcy cases as well as the procedural posture of her derivative claims, which have not advanced beyond certain preliminary rulings and are many months, if not years, away from a trial. *See, e.g.,* ECF No. 2 ¶¶ 8-10 (stating that this case was commenced "to position the Company to obtain a refinancing or restructuring even over the anticipated objections of Michelle as a minority shareholder" for all of the Simry Properties).

39.     Moreover, the mere fact that a Chapter 11 case stays pending litigation, even on the eve of trial, is not *prima facie* evidence of bad faith or an intent to use the bankruptcy system for a litigation advantage. *In re SPAC Recovery Co.*, 676 B.R. at 719 (collecting cases). Instead, where a debtor files for bankruptcy for legitimate reasons independent of tactical delay, the bankruptcy case was not commenced in bad faith. *Id.* at 720; *see also In re 221-06 Merrick Blvd. Assocs. LLC*, 2010 Bankr. LEXIS 4431, at *9 (Bankr. E.D.N.Y. Dec. 3, 2010) (holding that commencement of bankruptcy case to pursue a loan modification was not bad faith even where case frustrated lender's foreclosure efforts).

40.     Here, there is no tactical delay because Michelle's lawsuits are still in their infancy and not close to adjudication. In neither action was the state court close to making a determination on the merits. Insofar as the BCL recission-related claims were concerned, the First Department merely found issues of fact requiring discovery and ultimately a trial. For purposes of bankruptcy, the validity of the mortgages can be addressed far more expeditiously in the context of a claims objection process, under which the Bankruptcy Court retains core jurisdiction. *See* 28

19

U.S.C. § 157(b)(2)(B) and (K). Likewise, the value of Michelle's stock interests can also be first established by the Bankruptcy Court under its core jurisdiction to determine and fix equity relationships pursuant to 28 U.S.C. § 157(b)(2)(O).

41. The timing of the petition was driven by the status of the mortgage restructuring and the foreclosure pressure facing the Simry Properties, not by any particular state-court deadline. By June 2026, the properties were burdened by matured mortgage debt, pending foreclosure actions, accruing default interest, and the need to coordinate the anticipated SPE filings. Those circumstances, not any desire to evade discovery or appellate practice, explain the petition date.

42. Simry filed first because it is the equity parent whose ownership and governance rights are the subject of Michelle's litigation, and the uncertainty surrounding those rights has impeded the mortgage restructuring of the property-owning SPEs. Commencing Simry's case first was therefore a necessary predicate to stabilizing the enterprise and coordinate the forthcoming SPE filings.

43. Other considerations militate against a finding of subjective bad faith by the Debtor. The Debtor's stated goal is to preserve the value of its interests in the Simry Properties by pursuing a restructuring of the mortgage debt and reducing the litigation and related impediments to restructure the SPEs. Secondly, given the extensive mortgage debt, which will invariably come to involve the Lenders directly, there is much more at stake here than a two-party dispute. *See, e.g.,* Motion at 20-21.

44. Tangible progress has been made since the commencement of this bankruptcy case relating to a modification of the mortgages securing the Haruvi portfolio to separate the Simry Properties for restructuring in their own Chapter 11 cases. This progress bodes well for the Debtor's follow-up restructuring negotiations with the Lenders. *See, e.g., In re 68 W. 127 St.,*

*LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) ("When a debtor is motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.") (cleaned up); *see also In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987) ("[T]he court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended").

### D.    The Debtor's Bankruptcy Case is Not Objectively Futile

45.    The Debtor's bankruptcy case is certainly not objectively futile.  It has the ability to achieve a refinancing of the debts of the Simry Properties, as, in fact, the Debtor anticipates that it will receive the support of the Lenders.

46.    A case is "objectively futile" only where "there is no reasonable possibility that the debtor will emerge from bankruptcy." *In re JJ Arch*, 663 B.R. at 722.  This means that "there is no realistic prospect for a successful rehabilitation or reorganization under Chapter 11," including where a debtor "has not filed a plan and is unable to do so." *In re Tucker*, 5 B.R. 180, 184 (Bankr. S.D.N.Y. 1980).

47.    In arguing that these cases are objectively futile, Michelle relies upon the Debtor's perceived lack of creditors, cash flow, and employees, among other things.  Motion at 20-24.  Michelle once again suffers from tunnel vision.  The Debtor identified a realistic path to reorganization at the outset of these cases: a restructuring of the Simry Properties after the commencement of Chapter 11 cases on behalf of the SPEs.  This will bring into play a number of creditors and employees, plus active business operations generating substantial monthly income under the umbrella of this case.  ECF No. 2 ¶ 8.

48.     Even, *arguendo*, with the supposed "flaws" identified by Michelle, this case is still not objectively futile.   Michelle's complaints are premature at best, and the perceived obstacles to confirmation of a plan of reorganization are purely speculative.  *In re SPAC Recovery Co.*, 676 B.R. at 723 ("The objective futility inquiry is not a trial on plan confirmation. It merely asks whether there is any *realistic path* to a confirmable outcome, including a liquidating plan, given the debtor's posture and assets at the outset.") (citations omitted) (emphasis in original).

49.     In conclusion, Simry's bankruptcy stands at the tip of an iceberg, so to speak. The SPEs are frozen from seeking restructuring of the Simry Properties because of pending internal shareholder litigation.  It is far too early for Michelle to establish a definitive negative assessment regarding the Debtor's overall reorganization prospects.  Instead, the process should be allowed to unfold for a reasonable period of time after the SPEs seek chapter 11 relief in their own right, at which point there will be a clear path forward towards obtaining much needed mortgage relief. Given this dynamic, all bad faith contentions raised by Michelle should be overruled.

WHEREFORE, for all of the reasons set forth above, the Debtor respectfully submits that Michelle has failed to carry her burden to show that the Debtor's bankruptcy case was unauthorized or commenced in bad faith and therefore the Motion should be denied in its entirety.

Dated: New York, New York
July 31, 2026

Goldberg Weprin Finkel Goldstein LLP
Attorneys for the Debtor
125 Park Avenue, 12th Floor
New York, NY 10017

By:     /s/ Kevin J. Nash, Esq.

22